**In re Donald E. SCHMIDT and Helen M. Schmidt, Debtors.**

**Bankruptcy No. 87–10033–INH.**

United States Bankruptcy Court, D. South Dakota, N.D.

June 11, 1991.

Terry J. Sutton, Watertown, S.D., for debtors.

Thomas Pokela, Sioux Falls, S.D., Chapter 12 Trustee.

Thomas Lloyd, Pierre, S.D., for defendants.

## MEMORANDUM OF DECISION RE: MOTION FOR DISCHARGE

IRVIN N. HOYT, Chief Judge.

The matter before the Court is Debtors' Motion for Discharge and the objections thereto. This is a core proceeding under 28

1. Debtors' Motion for Discharge was filed prior to the March 1, 1991 effective date of amended

U.S.C. § 157(b)(2). This ruling shall constitute Findings and Conclusions as required by Bankr.R. 7052.

I.

Debtors Donald E. and Helen M. Schmidt (Debtors) filed a Chapter 12 petition for debt adjustment on January 26, 1987. Their plan was confirmed on August 27, 1987. On November 28, 1990, they filed a Motion for Discharge[1] claiming all plan payments had been made. Creditor Farmers Home Administration objected to the Motion on the grounds that Debtors had not made disposable income payments, as required by 11 U.S.C. §§ 1225(b) and 1228(a) and the terms of their plan. Chapter 12 Trustee A. Thomas Pokela (Trustee) also objected. He argued Debtors had failed to disclose the proceeds of their 1990 crop.

A hearing was held May 3, 1991. Debtors presented testimony and exhibits on their post-petition credit history and financial status. Much of their presentation focused on whether Debtors should be required to borrow funds for 1991 crop expenses or use cash on hand for these expenses in lieu of making disposable income payments to unsecured claim holders.

Debtors' 1987, 1988, and 1989 tax returns, two Annual Reports of Operations for 1988 (an original and an amended report), Annual Report of Operations for 1989, and Report of Operations for 1990 (through October, 1990) were received into evidence. Testimony by Debtor-husband established that Debtors had received approximately $177,000.00 in income since November, 1990 when regular plan payments were completed. It was also shown that Debtors had expanded their farming operation from 500 to 600 acres in 1987 and 1988 to 1,100 acres in 1990. The additional acres were rented. Debtors testified that the added farm ground was needed to insure adequate income to meet plan payments.

Local Bankr.R. 309, which governs the Chapter 12 discharge procedure.

Debtor-husband stated they had borrowed operating expenses from Farmers Home Administration for twelve to fifteen years prior to their Chapter 12 filing. Although Debtors had not obtained a line of credit from a financial institution for operating expenses during their plan, they had received fertilizer and other "inputs" on credit at the local elevator for several years. Debtors attempted to get an operating loan once during their plan. That potential lender, referred by the local elevator, refused to give Debtors any credit because of Debtors' pending bankruptcy.

Debtors introduced a recently compiled summary and some supporting documents on their 1990 corn, sunflower, and barley production levels, which were lower than those reported in their 1990 annual report. Debtor-husband testified that the 1990 annual report filed in October, 1990 contained only production estimates. Debtors also introduced three additional expense reports that summarized Debtors' total crop production expenses for January through August of 1988, 1989, and 1990 and for January through April of 1991; presented November and December, 1990 expenses related to the 1990 crop year; and detailed their 1991 crop input expenses for January through April, 1991. Other than the exhibits that restated Debtors' actual crop production levels for 1990, neither Debtors nor Trustee disputed the income and expenses reported on Debtors' annual reports to Trustee.

## II.

Disposable income is the difference between available income and allowed expenses during the repayment period. 11 U.S.C. § 1225(b)(2). Necessary expenses are those "reasonably necessary ... for the maintenance or support of the debtor [and his family]" or "the continuation, preservation, and operation of the debtor's business" [hereinafter "necessary expenses"]. *Id.* The disposable income payment period begins on the date that the first payment is due under the plan and ends three years later or longer, if the term of the plan has been extended. 11 U.S.C. § 1225(b)(1)(B).

Chapter 12 debtors and Standing Trustees should not treat the disposable income payment period as a finite term during which a debtor's income and expenses are examined. As a fiduciary, a Chapter 12 debtor-in-possession must prudently operate the debtor's farm and other businesses for the benefit of all creditors. Income generated and expenses incurred during the post-petition, pre-confirmation period should inure to the creditors' benefit under the best interest of creditors test pursuant to 11 U.S.C. § 1225(a)(4). Similarly, income generated during the plan should be recognized as potential disposable income. For example, if the first regular payment under a plan is made one year after confirmation, income during that year (before the disposable income payment period begins) should not be disregarded. Instead, a debtor's use of these funds must be examined since any amount remaining after payment of allowed expenses should be available for unsecured creditors when the disposable income payment period begins. *In re Wood,* 122 B.R. 107, 114–15 (Bankr.D.Idaho 1990). Further, a Chapter 12 debtor should not manipulate post-confirmation income and expenses in order to avoid the disposable income payment "window." Such endeavors may result in the denial of discharge. 11 U.S.C. §§ 1208(c)(4), 1208(d), and 1228(d); *In re Kuhlman,* 118 B.R. 731, 739 (Bankr.D.S.D. 1990).

If a creditor or the trustee successfully argues that all disposable income has not been paid under the plan, a debtor may not receive a discharge unless he can show that there was no available income in excess of necessary expenses. While a party objecting to discharge has the burden of proving the merits of their objection, Bankr.R. 4005 and *Education Assistance Corp. v. Zellner,* 827 F.2d 1222, 1226 (8th Cir.1987), the debtor has the ultimate burden of persuasion to show that all payments under the plan have been made, including payments of disposable income. *In re Kuhlman,* 118 B.R. 731, 738 (Bankr. D.S.D.1990). Further,

[w]hen a determination of disposable income is presented to the Court as a contested matter, each case must be examined upon the evidence presented. The Court will determine under the totality of the circumstances whether the debtor's expenses were reasonably necessary for family support and continuation, preservation, and operation of the farm, as required by § 1225(b)(2). Factors the Court may consider include the amount of and reason for any variance in a debtor's actual income and expenses from those projected in the plan, the debtor's past borrowing practices, the availability of credit, and the necessity of any capital improvement.

. . . .

Undocumented numbers or mere estimates of past years' income and expenses will not be accepted. Projections of income and expenses offered to show the funds needed to continue the operation (such as seed and fertilizer for the coming crop year) must be grounded on historical figures.

The trustee, as well as the Court and creditors, should be able to rely on the accuracy of the monthly and annual financial reports prepared by Debtors. ... [A] debtor's failure to turn over disposable income or his efforts to hide assets or otherwise hinder the trustee's verification of financial information may constitute fraud.

*Id.* at 739.

■ This Court has not adopted a per se rule on whether a Chapter 12 debtor must obtain financing to preserve disposable income. *Id.* Rather, in each case the Court will determine whether the reorganizing debtor should obtain financing of some business expenses to shield disposable income. The Court is mindful, however, that operating credit is common in farming. *In re Wood*, 122 B.R. 107, 116 (Bankr.D.Idaho 1990). While the Code provides that disposable income may not include funds that are needed to meet some impending necessary expenses, it does not demand that all such expenses be met without obtaining credit if a debtor can obtain affordable credit. *Id.* at 116 n. 10. A Chapter 12 debtor should be given a fresh start at discharge, not a head start nor a guarantee of post-bankruptcy success. *In re Bowlby*, 113 B.R. 983, 989 (Bankr. S.D.Ill.1990). Unsecured creditors should not have to involuntarily finance a debtor's operation by being deprived of available disposable income if operating credit can be reasonably obtained and afforded by a debtor. *Wood*, 122 B.R. at 116 n. 10 and 118.

### III.

■ Calculation of disposable income in this case should not have been as onerous task. In this as well as most Chapter 12 cases in which discharge is contested due to a debtor's alleged failure to pay disposable income, four questions need to be answered. First, what is the disposable income payment period? Second, what was the debtor's available income at the commencement of and during that period, including the value of unsold but marketable farm commodities? Third, what were the debtor's necessary expenses during that period? Fourth, what amount of income, if any, may be retained as "reasonably necessary ... for the maintenance or support of the debtor [and his family]" or "the continuation, preservation, and operation of the debtor's business" as permitted by § 1225(b)(2)? The answer to these questions will determine the disposable income, which is simply the difference between the debtor's available income and allowed expenses during the payment period.

### A.

According to Debtor's restated plan filed August 19, 1987, the first payment under the plan was scheduled for December 1, 1987 to Federal Land Bank. While some administrative expenses such as attorney fees may have been paid earlier than December 1, 1987, the plan does not so state. Further, neither party presented any evidence on the repayment period. Accordingly, the Court will not assume that a plan

payment was made earlier than December 1, 1987. Since this is a three-year plan, the disposable income payment period began December 1, 1987 and ended December 1, 1990.

B.

The starting point for calculating Debtors' income and expenses during the repayment period is Debtors' annual reports.[2] The Court found the following:

### 1988

| Income: | |
|---|---|
| grain sales | $ 86,699.22 |
| gov't. payments | 39,014.04 |
| rent & interest | 9,546.00 |
| misc. & dividends | 14,342.00 |
| | $ 149,601.26 |

| Allowed Expenses[3]: | |
|---|---|
| farm | $ 99,953.58 |
| living | 17,389.00 |
| | $ 117,342.58 |

| Commodities (not reported sold in subsequent report): [4] | |
|---|---|
| '88 soybeans, 300 bushels | $ 1,800.00 |
| '88 barley, 1,000 bushels | 2,000.00 |
| '88 hay, approx. 10 ton | 304.00 |
| | $ 4,104.00 |

| | |
|---|---|
| Cash, beginning | $ 20,000.00 |
| Income less expenses | 32,258.68 |
| Unsold commodities | 4,104.00 |
| | $ 56,362.68 |

| | |
|---|---|
| less cash carried forward | 25,000.00 |
| 1988 DISPOSABLE INCOME | $31,362.68 |

### 1989

| Income: | |
|---|---|
| grain sales | $ 88,930.00 |
| gov't. payments | 14,035.00 |
| misc. farm income | 9,450.00 |
| non farm income | 8,225.00 |
| | $ 120,640.00 |

| Allowed Expenses: | |
|---|---|
| farm | $ 91,245.00 |
| plan & mortgage payments | 32,100.89 |
| capital expenditures | 24,129.00 |
| living | 17,877.79 |
| | $ 165,352.68 |

2. Neither party attempted to establish exact income and expenses figures from December 1, 1987 through December 1, 1990, the actual disposable income payment term. Consequently, the Court had to rely on the annual reports which fortunately coincided almost exactly with the disposable income repayment term.

3. A soybean seed expense of $6,808.46 listed on the annual report is not included because the report said they would not pay that bill until 1989.

4. While Debtors listed these commodities as "Beginning Inventory," the Court can only assume they meant "End of Year Inventories," since all commodities listed were for the current crop year. In 1989, Debtors reported that they sold some 1988 corn for $22,948. They also reported in 1990 that they sold some 1988 hay for $496.00. Those are reported in 1989 and 1990 income respectively, not in 1988 income.

Unsold Commodities (not reported sold in subsequent report): [5]

| | | |
|---|---|---:|
| '89 hay, 10 ton | $ | 500.00 |
| | $ | 500.00 |

| | | |
|---|---|---:|
| Cash, beginning | $ | 25,000.00 |
| Income less expenses | | <44,712.68> |
| Unsold commodities | | 500.00 |
| | $ | <19,212.68> |

| | |
|---|---:|
| less cash carried forward | 16,021.37 |
| 1989 DISPOSABLE INCOME | <$35,234.05> |

---

### 1990[6]

At the hearing, Debtors testified that their actual 1990 production levels were less than stated on their 1990 annual report and that a government program payment of $5,162.00 was not reported on the 1990 annual report. When those production figures and additional income plus Debtors' November and December, 1990 expenses are used to amend Debtors' 1990 annual report, disposable income for 1990 is as follows:

Income:

| | |
|---|---:|
| '89 corn | $ 65,438.45 |
| '88 hay | 496.00 |
| '90 wheat | 13,168.65 |
| '90 soybeans | 8,233.01 |
| '90 corn (47,919.66 bushels) | 103,985.66[7] |
| '90 sunflowers (86,406 lbs.) | 8,856.61 |
| gov't. payments | 38,901.88 |
| misc. farm income | 14,965.40 |
| non-farm income | 393.98 |
| | $254,439.64 |

Expenses:

| | |
|---|---:|
| plan & mortgage payments | $ 30,440.68 |
| farm | 136,019.65 |
| capital expenditures | 3,013.08 |
| living | 17,510.85 |
| | $186,984.26 |

Unsold Commodities: [8]

| | |
|---|---:|
| '90 wheat, 2145 bushels | $ 5,534.10 |
| '90 corn, 1,000 bushels | 2,250.00 |
| '90 barley, 2,667 bushels | 4,933.95 |
| | $ 12,718.05 |

| | |
|---|---:|
| Cash, beginning | $ 16,021.52 |
| Income less expenses | 67,455.38 |
| Unsold commodities | 12,718.05 |
| | $ 96,194.95 |

5. In 1990, Debtors reported that they sold $65,438.45 worth of 1989 corn, over $25,000 more than they reported they had on hand at the end of 1989. The amount sold is included in 1990 income.

6. If Debtors' 1990 Annual report is solely analyzed without any modification based on evidence presented at the May 3, 1991 hearing, disposable income for that year totals $91,184.45. The 1990 annual report ran only through October 31, 1990 so one month of income and expenses for the disposable income payment period, which ended December 1, 1990, was not reported.

7. An estimated average price per bushel of $2.17 was used by the Court based on Debtors' Exhibits E and F and Debtor-husband's testimony.

8. Local prices reported on May 14, 1991 were used by the Court.

| | |
|---|---|
| <u>less</u> cash carried forward | $ 23,058.62 |
| 1990 DISPOSABLE INCOME | $ 73,136.33 |
| | |
| 1988 Disposable Income | $ 31,362.68 |
| 1989 Disposable Income | <35,234.05> |
| 1990 Disposable Income | 73,136.33 |
| Cash on Hand, October, 1990 | 23,058.62 |
| TOTAL DISPOSABLE INCOME | $ 92,323.58[9] |

Since Trustee did not specifically challenge any expenditure, the Court could only conclude that all reported expenses and capital improvements were "reasonably necessary ... for the maintenance or support of the debtor [and his family]" or "the continuation, preservation, and operation of the debtor's business" pursuant to § 1225(b)(2). Some mathematical errors in the annual reports were corrected prior to their inclusion here. The most recently reported figure was used for ending cash on hand for one year and the beginning cash on hand for the next year whenever a discrepancy occurred.

### C.

■■■ The final question is have Debtors' shown that all available cash and commodities on hand must be retained as "reasonably necessary ... for the maintenance or support of the debtor [and his family]" or "the continuation, preservation, and operation of the debtor's business" as permitted by § 1225(b)(2)? Three issues needed to be addressed in this case to answer that question but the parties have failed to offer sufficient evidence for the Court to do so.

First, Debtors attempted to persuade the Court that they should not be required to borrow any funds for their 1991 crop expenses. They stated that they did not attempt to borrow operating expenses during the plan because they understood they were not permitted to do so. Trustee argued that Debtors borrowed funds prior to reorganizing and that it was reasonable for them to do so again.

The evidence presented by either side did not conclusively establish that Debtors should seek credit for 1991 expenses. While there was some evidence about Debtors' pre-petition credit history with Farmers Home Administration, there was only limited evidence that Debtors could obtain financing now. There was no conclusive evidence of the amount of or terms at which credit might be available to them. There was no evidence of the borrowing practices of similarly situated grain farmers in Debtors' area. However, Debtors bear the burden of showing they are entitled to discharge. At any subsequent discharge hearing, it will be their burden to show that borrowing is not reasonable or feasible for them. If they establish that credit is not a viable option, then they must show the specific amount of available income that must be retained to meet expenses allowed by § 1225(b)(2).

Second, Debtors failed to clearly show the Court what 1990 or 1991 crop year expenses remain unpaid and what additional 1991 expenses would be incurred. While Debtors argued they should be permitted to retain all income to meet leftover 1990 crop expenses and impending 1991 crop expenses, there was some testimony that all expenses to date had been paid from the substantial amount of income Debtors have received since October, 1990. Moreover, Debtors could not identify what additional expenses would be incurred through August, 1991. Accordingly, the Court could not determine the funds, if any, that should be retained to meet allowed expenses.

**9.** When Debtors' federal income tax returns are reviewed, they indicate Debtors had $31,607.00 in disposable income in 1988 and <$7,520.79> in 1989 (income less farm expenses, excluding depreciation, less living expenses as stated on Debtors' corresponding annual report). These figures support the Court's conclusions based on Debtors' annual reports for those years. Debtors' 1990 federal tax return was not put in evidence.

Third, Debtors argued that an expansion of their farming operation, and thus their expenses, was necessary to insure that plan payments were made. While there is some evidence that Debtors' operation as proposed in their plan was not feasible, there was insufficient evidence for the Court to conclude that all expenses associated with the expanded farming operation were reasonable for the "preservation, continuation, and maintenance" of Debtors' farming operation. At any rehearing on discharge, Debtors will need to show the income and expenses associated with the additional acres farmed, demonstrate the necessity of farming that size of operation during the plan, and establish the reasonableness of retaining funds to continue that size of an operation post-discharge.

See also 139 B.R. 476; 139 B.R. 485.

Since Debtors' annual reports and tax returns both indicate that substantial disposable income should be available for payment of unsecured claims even if Debtors retain some income to meet 1991 expenses, the Court concludes that Debtors have not completed all plan payments. An order denying Debtors' Motion for Discharge will be entered. The order will be without prejudice. Debtors may again seek discharge when they can show that all plan payments have been made by satisfying the evidentiary shortfalls discussed above. Debtors are cautioned that they should resolve this matter as soon as possible to avoid possible dismissal of their case under 11 U.S.C. § 1208(c)(4) for failure to make timely plan payments.